IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

TEIA HASSEY,

Plaintiff,

CV 05-1169-ST

v.

MICHAEL J. ASTRUE, Commissioner of Social Security,

OPINION AND ORDER

Defendant.

STEWART, Magistrate Judge:

**INTRODUCTION**

Plaintiff, Teia Hassey ("Hassey"), brings this action for judicial review of a final decision of the Commissioner of Social Security denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act. Hassey alleges a disability beginning on

November 10, 2000. Tr. 90.[1] The court has jurisdiction under 42 USC § 405(g). The parties have consented to allow a Magistrate Judge to enter final orders and judgment in this case in accordance with FRCP 73 and 28 USC § 636(c). For the reasons set forth below, the Commissioner's decision is affirmed.

## STANDARD OF REVIEW

The district court must affirm the Commissioner's decision if it applies the proper legal standards and is supported by substantial evidence in the record. 42 USC § 405(g); *Andrews v Shalala*, 53 F3d 1035, 1039 (9th Cir 1995). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*

If substantial evidence can reasonably support either affirming or reversing the Commissioner's conclusion, the court may not substitute its judgment for that of the Commissioner. *Batson v Comm'r of Soc. Sec.*, 359 F3d 1190, 1193 (9th Cir 2004). The Commissioner's decision must be upheld, even if the "evidence is susceptible to more than one rational interpretation." *Andrews*, 53 F3d at 1039-40.

## DISABILITY ANALYSIS

The burden of proof rests upon the claimant to establish disability. *Tackett v. Apfel*, 180 F3d 1094, 1098 (9th Cir 1999); *Roberts v. Shalala*, 66 F3d 179, 182 (9th Cir 1995). To meet this burden, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 USC § 423(d)(1)(A).

[1] Citations to "Tr." are to the page(s) indicated in the administrative record (docket #12).

The Commissioner has established a five-step sequential process for determining whether a person is disabled within the meaning of the Act. *Bowen v. Yuckert*, 482 US 137, 140 (1987); 20 CFR § 404.1520. Each step is potentially dispositive.

At step one, the claimant is not disabled if the Commissioner determines that the claimant is engaged in substantial gainful activity. *Yuckert*, 482 US at 140; 20 CFR § 404.1520(b).

At step two, the claimant is not disabled if the Commissioner determines that the claimant has no "medically severe impairment or combination of impairments." *Yuckert*, 482 US at 140-41; 20 CFR § 404.1520(c).

At step three, there is a conclusive presumption that the claimant is disabled if the Commissioner determines that the claimant's impairments meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Yuckert*, 482 US at 140-41; 20 CFR § 404.1520(d). The criteria for these listed impairments, also called Listings, are enumerated in 20 CFR Part 404, Subpart P, Appendix 1 (Listing of Impairments).

If the adjudication proceeds beyond step three, the Commissioner must assess the claimant's residual functional capacity ("RFC"). The claimant's RFC is an assessment of the sustained work-related activities the claimant can still do on a regular and continuing basis, despite the limitations imposed by his impairments. 20 CFR § 404.1545(a); Social Security Ruling ("SSR") 96-8p.

At step four, the claimant is not disabled if the Commissioner determines that the claimant retains the RFC to perform work she has done in the past. 20 CFR § 404.1520(e).

If the adjudication reaches step five, the Commissioner must determine whether the claimant can perform other work that exists in the national economy. *Yuckert*, 482 US at 141-42; 20 CFR § 404.1520(e), (f). Here the burden shifts to the Commissioner to show that a significant number of jobs exist in the national economy that the claimant can do. *Yuckert*, 482 US at 141-42; *Tackett v. Apfel*, 180 F3d 1094, 1100 (9th Cir 1999). If the Commissioner meets this burden, then the claimant is not disabled. 20 CFR § 404.1566.

## PROCEDURAL BACKGROUND

On January 4, 2002, Hassey applied for DIB, alleging that she became disabled on November 10, 2000, due to "blindness and abnormal knee bending causing lots of pain to do everyday functions." Tr. 88A-C, 89-98. Hassey's application was denied initially on April 2, 2002 (Tr. 42-52) and on reconsideration on October 3, 2002 (Tr. 57-63). After a timely request, a hearing before an Administrative Law Judge ("ALJ") was held on July 13, 2004. Tr. 64, 376-406.

Hassey satisfied the insured status requirements for a claim under Title II through the date of the ALJ's decision on October 4, 2004. Tr. 21.[2] She must establish that she was disabled on or before her date last insured in order to prevail on her claim. 42 USC § 423(a)(1)(A); *Tidwell v. Apfel*, 161 F3d 599, 601 (9th Cir 1998).

## FACTUAL BACKGROUND

Both the Commissioner and Hassey have adopted the ALJ's summary of the medical evidence. Accordingly, those records will not be recounted in detail here. However, several

---

[2] An April 17, 2004 report indicated that Hassey's date last insured was September 30, 2005 (Tr. 88D), but that date may have changed due to her subsequent work at Wells Fargo.

dates from Hassey's medical and employment history of particular importance in evaluating her appeal are summarized below.

Born in 1973, Hassey was 27 years old on her alleged onset date and age 31 on the date of the ALJ's decision. Hassey's education includes high school and three years of studying radiology in technical college. Tr. 96, 235. Between the ages of 21 and 27, Hassey worked as a warehouse stocker (August - November 1994 and July - September 1995), salad bar attendant (March - June 1995), retail salesperson (September 1995 - April 1996), sales clerk (April - June 1996), production worker (June 1996 - February 1998) horse manager (February - September 1998), telephone customer service call out person (September 1998 - April 1999), sales person of farm supplies (April 1999 - August 2000), and horse trainer (April 1999 - November 2000). Tr. 91, 125, 403.

In late 1998, Hassey injured her knees in a skiing accident. Tr. 158. She received physical therapy and left knee bracing with fairly good results, but in 2000 began experiencing repetitive pain and "giving way." Tr. 172. Due to worsening symptoms related to the knee, she stopped working in November 2000.

On February 20, 2001, Hassey received medical treatment addressing her orthopedic (knee) issues and had left knee surgery. Tr. 172-76. In January 2002, when she filed her application for DIB, Hassey alleged disability due to "abnormal knee bending causing lots of pain to do everyday functions." Tr. 90. Her statement of Activities of Daily Living and Socialization, prepared February 13, 2002, identified knee pain and headaches as the sources of

her difficulties.[3] Tr. 115-21. She reportedly avoided attending noisy events. Tr. 119 ("With my knee pain, I am always one step away from a headache so I no longer go to loud games or events with a lot of noise.") However, she described no other limitation related to headaches.

On February 1, 2003, Hassey was a passenger in a stopped SUV that was hit from behind by a utility truck loaded with freight and traveling about 35-40 miles per hour. Tr. 209, 263-64. Hassey was thrown forward, struck her head on the windshield, and immediately experienced dizziness, lower abdominal pain, and nausea. Tr. 210, 264, 283. Over the course of the next several months, Hassey experienced a host of symptoms including headaches, dizziness including lightheadedness and vertigo, balance problems, photophobia, earaches, tinnitus, back, neck and shoulder pain, memory and concentration difficulties, fatigue, and global muscle and joint pain. Tr. 216, 282. After a neurological consultation on May 28, 2003, Robert J. Grimm, M.D., diagnosed an inner ear concussion, neuropathic pain syndrome, possible fibromyalgia syndrome, and resolving neuropraxia of the right ulnar nerve, all post-traumatic and related to the motor vehicle accident. Tr. 209.

For a year between May 5, 2003, and May 21, 2004, Hassey received regular physical therapy and chiropractic treatments. On June 23, 2003, she also sought treatment for global muscle and joint pain with Peter Bonafede, M.D. Tr. 246-49. At that time, she reported exercising "by hiking, biking, and sometimes riding horses" and was planning to look for a job

---

[3] Hassey's application for DIB was also premised on "[b]lindness" (Tr. 90) and she cited difficulties with "bad vision" in her February 2002 statement (Tr. 118). The vision problems have been present since Hassey was in high school. Tr. 259. A March 5, 2002 examination revealed bilateral myopia and recommended that Hassey "continue with contact lenses or glasses for driving" and "have a routine eye exam after two years." Tr. 194. Hassey also experienced "restless leg syndrome" following her knee surgery, which is treated with medications. Tr. 247, 250. Hassey does not contend that the ALJ erred by failing to find her vision difficulties or restless leg syndrome severe and does not otherwise contend that those impairments impose vocationally relevant restrictions on her that the ALJ failed to consider. Thus, this court does not further consider Hassey's vision difficulties or restless leg syndrome in assessing the propriety of the Commissioner's decision.

because she was moving to the Portland area. Tr. 247. In August 2003, Hassey began working for Wells Fargo as a collections agent. Tr. 286, 380. At the hearing before the ALJ on July 13, 2004, she reported missing a week of work in May 2004 and three days of work in June 2004 due to dizziness. Tr. 381. Although she had approached her supervisor about working fewer hours, she had not given notice that she intended to terminate her employment. Tr. 381-82. On July 22, 2004, Wells Fargo granted Hassey's request for intermittent medical leave from work. Tr. 151.

**THE ALJ's DECISION**

The ALJ determined that between August 2003 and the date of the hearing on July 13, 2004, Hassey had worked full time at Wells Fargo and earned approximately $1,600 per month. Tr. 22, 38. Although he found this to be substantial gainful activity, he declined to further develop the record to determine the full extent of Hassey's work activity and did not make a step one finding, concluding that her claim should be denied at step four. *Id*.

At steps two and three, the ALJ determined that Hassey is "status post ACL reconstruction left knee (February 2001), fibromyalgia and myopia," which were "severe" impairments, but did not meet or medically equal one of the Listings. Tr. 22-23, 39. The ALJ then determined that Hassey has the RFC to perform a "full range of light work reduced by non-exertional limitations." Tr. 37, 39. Specifically, because of "pain/discomfort she should never climb or crawl," but "is able to occasionally crouch or kneel." *Id*.

At the hearing, the ALJ received testimony from a vocational expert ("VE"). The VE described Hassey's past relevant work in terms of the level of skill and physical exertion required for each occupation. Tr. 403. The VE testified that a person of Hassey's age (27),

educational background (high school and three years of college), work experience, and RFC, as described by the ALJ, could still perform jobs as a production worker, cashier, sales person, and salad bar attendant, as well as the job Hassey was then performing of a customer call out person. Tr. 403-04. However, the VE also testified that if Hassey's testimony regarding the effects of her headaches, tinnitus, dizziness, limitations on walking and standing were credited, she would not be able to perform her past relevant work. Tr. 404. Specifically, he found that her "continuous headaches that appear to interfere with any kind of activity [would preclude] any type of job." Tr. 404.

At step four, the ALJ found that Hassey could perform her past relevant work as a telephone customer service operator, production worker, and sales clerk. Tr. 38, 39. Accordingly, the ALJ determined that Hassey was not disabled and is not entitled to benefits under Title II of the Act.

## DISCUSSION

Hassey raises three challenges to the Commissioner's decision. First she argues that the ALJ erred at step two by not finding several of her impairments severe. She also asserts that the ALJ gave insufficient reasons to discredit her testimony regarding the limitations imposed by her impairments, leading him to an incorrect RFC assessment. Finally, Hassey contends that the ALJ erred at step four based on the incorrect RFC assessment and the undue weight he gave to her work between August 2003 and the date of the hearing. Each of these arguments is rejected.

### I. Step Two Severity Findings

Hassey first argues that the ALJ erred at step two by failing to find several of her documented impairments severe. At step two, the ALJ's task is to determine whether any

combination of impairments has more than a minimal impact on the claimant's ability to do basic work activities. The inquiry is a *de minimis* screening tool to dispose of groundless claims before evaluating all the evidence in the remaining steps. *Smolen v. Chater,* 80 F3d 1273, 1290 (9th Cir 1996). The ALJ did not find Hassey disabled at step two due to a lack severe impairments. Instead, he found that Hassey had a combination of severe impairments, namely ACL reconstruction, fibromyalgia, and myopia. Tr. 34, 39.

For purposes of step two, an ALJ considers an impairment severe unless the medical evidence clearly establishes that the claimant's impairments have no more than a minimal effect on the claimant's ability to do basic work activities. SSR 85-28. Thus, by finding a severe impairment at step two, the ALJ concludes only that the medical evidence fails to clearly establish the absence of severe impairments. Moreover, when an ALJ finds a medically severe combination of impairments, no regulation requires the ALJ to attribute specific functional limitations to each impairment separately. Instead, the ALJ is required to consider the combined effect of all of the claimant's impairments throughout the decision-making process. 20 CFR § 404.1523. The identification of specific functional limitations is done later in the decision-making process during the evaluation of the claimant's RFC. At that stage, the ALJ is not limited to the medical evidence, but must account for all the evidence. The ALJ must consider the claimant's description of symptoms, medical opinions, lay statements and any other relevant evidence in the record. SSR 96-8p.

Here the ALJ found that the objective medical evidence of a reconstructed ACL in her left knee, fibromyalgia, and myopia established impairments sufficiently "severe" to preclude a determination that Hassey was not disabled at step two. Then the ALJ correctly proceeded

through the remaining steps of the decision-making process and evaluated all the evidence in the record to determine Hassey's functional limitations. Step two does not require each of the alleged impairments be categorized as either "severe" or "non-severe." Instead, the question is whether objective medical evidence of an impairment or combination of impairments is sufficient to preclude the Commissioner from denying the claim as groundless. Hassey's arguments regarding the impairments that the Commissioner did not specifically find severe are more appropriately addressed in the context of the sufficiency of the Commissioner's RFC findings.

**II. <u>Hassey's Credibility</u>**

The ALJ found that Hassey's subjective statements about her symptoms and their effect on her ability to perform work related activities "are not totally credible." Tr. 34, 39. Hassey contends that the ALJ applied improper standards to reach this conclusion.

If a claimant produces objective medical evidence of an underlying impairment that could reasonably be expected to produce the symptoms alleged and no affirmative evidence of malingering exists, the ALJ must assess the credibility of the claimant regarding the severity of symptoms. *Smolen*, 80 F3d at 1281-82; *Cotton v. Bowen*, 799 F2d 1403, 1407-08 (9th Cir 1986). In his extensive summary of the medical evidence and his findings, the ALJ acknowledged the objective medical evidence of Hassey's reconstructed ACL in her left knee, fibromyalgia, and myopia, but flatly rejected the conclusion that those impairments imposed restrictions as significant as Hassey alleged:

> The claimant has presented objective medical evidence that she has medically determinable severe impairments – she is status post ACL reconstruction left knee . . . [and] has fibromyalgia and myopia – that could reasonably be expected to produce significant

> exertional and non-exertional limitations in her ability to perform basic work activities, *but not to the degree she alleged in her subjective complaints*.

Tr. 34 (emphasis added).

The ALJ also rejected Hassey's testimony as to the restrictions imposed by her other impairments, based primarily on the lack of supporting objective medical evidence:

> The claimant's treating and examining physicians have not said she is unable to perform any substantial gainful activity, 8 hours a day, 5 days a week on an ongoing basis, nor, is there any objective medical evidence (i.e. clinical notes, range of motion studies, laboratory reports, etc.) that they have told her to restrict her activities to the extent she alleges she needs to do because of tinnitus, headaches, earaches, dizziness, restless leg syndrome, or repetitive shoulder movements after her motor vehicle accident on February 1, 2003.

Tr. 35.

Both the severe impairments, as well as the other impairments cited by Hassey, could reasonably be expected to cause some degree of work-related restrictions. Accordingly, the ALJ was required to assess the credibility of Hassey's statements.

The ALJ may discredit a claimant's testimony regarding the severity of symptoms by providing clear and convincing reasons for doing so. *Dodrill v. Shalala*, 12 F3d 915, 918 (9th Cir 1993); *Smolen*, 80 F3d at 1283. The ALJ must "state which . . . testimony is not credible and what evidence suggests the complaints are not credible." *Dodrill*, 12 F3d at 917-18; *Lester v. Chater*, 81 F3d 821, 834 (9th Cir 1995); *Reddick v. Chater*, 157 F3d 715, 722 (9th Cir 1998). When making a credibility evaluation, the ALJ may consider objective medical evidence and the claimant's treatment history as well as any unexplained failure to seek treatment or follow a prescribed course of treatment. *Smolen*, 80 F3d at 1284. The ALJ may also consider the

claimant's daily activities, work record and the observations of physicians and third parties in a position to have personal knowledge about the claimant's functional limitations. *Id; see also* SSR 96-7p.

The record reveals the severe impairment of the left knee resolved after the February 2001 surgery. In April and June 2001, Hassey had no complaints about her left knee and in June 2001 reported that it was feeling very well. Tr. 163-67. Instead, she began complaining about her right knee in July 2001, continuing through June 2002. Tr. 188-89, 177-80, 207-08. During this time, she tried unsuccessfully to work as a horse trainer, but reported that she enjoyed horseback riding, hiking with her dogs up to 30 minutes and bicycling for 15 to 20 minutes. Tr. 179, 184. An MRI of the right knee was essentially normal. Tr. 208. In November 2002 she reported only occasional "give-away" and pain in her left knee, and an orthopedic evaluation revealed no need for aggressive treatment. Tr. 232-33. In May 2004, Hassey reported that her knee problem "had substantially resolved." Tr. 325. It is noteworthy that none of her examining or treating physicians imposed restrictions on her activities due her knees after February 2001 to the extent she alleges.

With the exception of headaches, each of the non-severe impairments noted by the ALJ originated after Hassey was involved in the February 1, 2003 car accident. Hassey cites to areas in the record where these non-severe impairments are mentioned. Tr. 212-13 (May 7, 2003, dizziness and vision-dependent balance), 228 (June 6, 2003, dizziness and frequent headaches), 216 (December 19, 2003, tinnitus), 290 (May 24, 2004, chronic vertigo and intermittent difficulty with balance), 323 (June 17, 2004, balance problems and issues secondary to movement disorder), 286-87 (June 22, 2004, tinnitus and hyperacusis), 311-12 (June 29, 2004,

headaches, dizziness, tinnitus, atypical and repetitive shrugging of the shoulders), 370 (August 11, 2004, tinnitus and vertigo). However, each of those entries was made either just before or during the nearly year-long period when Hassey worked full-time for Wells Fargo, suggesting that she could work despite these impairments.

Hassey suggests that, even if her most recent work history precludes a finding of disability from that time to the present, the ALJ nevertheless should have concluded that she was prevented from working due to her impairments before she took the job with Wells Fargo in August 2003. However, the period of time between February 1, 2003, when these problems began due to the motor vehicle accident, and August 2003, when she began working for Wells Fargo, is less than 12 months. Thus, the impairments which either originated with, or were exacerbated by, the motor vehicle accident did not last the requisite 12 months. *See* 42 USC § 423(d)(1)(A). The one impairment of frequent headaches cited by Hassey as predating the motor vehicle accident is periodically mentioned in the medical records.[4] However, she never sought any particular treatment for that problem and repeatedly reported treating her headaches with over-the-counter medication. Tr. 123, 147.

In sum, the ALJ's credibility determination is supported by the combination of a lack of medical corroboration of Hassey's alleged limitations, the conservative treatment undertaken with respect to several of those impairments, good results with medications on at least two of those impairments (headaches and shoulder shrugging), the lack of any suggestion in the medical records that these impairments would significantly restrict work activities, and Hassey's subjective reports of only intermittent difficulties with balance.

[4] To her medical providers, she denied having headaches in February and March 2003 (Tr. 250, 259).

## III. Step Four Finding

### A. Disregarding State Agency Medical Examiners' Opinion

First, Hassey contends that the ALJ erred at step four by disregarding the opinion of the state agency reviewing physicians. On March 28, 2002, Sharon Eder, M.D. and Martin Kehrli, M.D., state agency reviewing physicians, performed an RFC Assessment and checked a box on a form indicating that Hassey could "[s]tand and/or walk (with normal breaks) for a total of . . . at least 2 hours in an 8-hour workday." Tr. 200. Hassey contends that this finding was ignored by the ALJ when he concluded that Hassey "can stand/walk for 6 hours in an 8 hour work day." Tr. 36. Hassey argues that her RFC should have included a restriction that she could only sit or stand for 2 hours in an 8-hour work day, precluding light work. *See* 20 CFR § 404.1567(b) (physical exertion requirements of light work include "a good deal of walking or standing" or "sitting most of the time with some pushing and pulling of arm or leg controls").

The ALJ did not explain why his finding is inconsistent with the finding of Drs. Eder and Kehrli. But even if Hassey could only stand or walk between 2 and 6 hours in an 8 hour workday in 2002, as found by the reviewing physicians, the situation had changed by the time the ALJ made his decision. At the hearing in July 2004, Hassey testified that she had been working for nearly a year from 11:00 am until 8:00 pm performing a "sedentary" job where she "just sit[s] at a desk." Tr. 395. That testimony provides an ample basis for the ALJ's conclusion that Hassey can, in fact, sit for nearly an entire work day and perform her past relevant work even with the limitations assessed by Drs. Eder and Kehrli. *See Pinto v. Massanari*, 249 F3d 840, 845 (9th Cir 2001) (a claimant is not disabled at step four if she can perform the job as she actually performed it or as generally performed). Therefore, the ALJ's failure to explain why his

findings differed from Drs. Eder and Kehrli is harmless error. *Parra v. Astrue*, 481 F3d 724, 747 (9th Cir 2007). (finding an error harmless when it would not affect the ultimate outcome of the decision).

**B. Trial Work Period / Reentitlement Period**

Hassey also argues that the ALJ also erred at step four by giving undue weight to her work at Wells Fargo between August 2003 and July 2004 and effectively denied her the opportunity for a "trial work period" under 20 CFR § 404.1592 and a "reentitlement period" under 20 CFR § 404.1592a.

If a claimant performed "services" in more than nine calendar months, then the claimant's work cannot be considered a "trial work period." 20 CFR 404.1592(a). The record indicates that as of the date of the administrative hearing, Hassey had worked for nearly a year at Wells Fargo. With the exception of a week off in May 2004 and a few days in June 2004 on account of symptoms she attributes to her impairments (dizziness), she apparently did so full-time, earning upwards of $1,600 per month. The record also indicates that she applied for intermittent family medical leave with Wells Fargo the same day as the administrative hearing, a request which Wells Fargo granted a week later, effective back to the date of the administrative hearing, July 13, 2004. In other words, she worked at Wells Fargo longer than allowed for a "trial work period."

Hassey also argues that, even if the "trial work period" was over, she was then in a "reentitlement period" pursuant to 20 CFR § 404.1592a. This regulation provides that "[i]ndividuals who earlier established a period of disability for which the [Commissioner] terminated benefits because of a cessation of the disability may become reentitled to disability

payments at a later date if they again satisfy all of the requirement of the [Social Security] Act." *Flaten v. Secretary of Health & Human Servs.*, 44 F3d 1453, 1460 (9th Cir 1995). Entitlement to a "reentitlement" period presupposes entitlement to a "trial work period." 20 CFR 404.1592a(c) ("You are not entitled to a reentitlement period if . . . (2) You are not entitled to a trial work period.").

In sum, the "trial work period" and "reentitlement period" regulations provide no basis on which to preclude the Commissioner from considering the work performed by Hassey during the nearly year long period just prior to the administrative hearing on her application for benefits.

## CONCLUSION

This court must affirm the Commissioner's decision if it is supported by substantial evidence, even if other conclusions can rationally be drawn from the same evidence. *Andrews*, 53 F3d at 1039-40. No treating or examining source has noted limitations of the magnitude that Hassey alleges. When viewed in light of her work history just prior to the administrative hearing, the ALJ's decision is amply supported by substantial evidence and must be affirmed.

## ORDER

Based on the foregoing, the ALJ's determination that Hassey did not suffer from a disability during the relevant period and is not entitled to benefits under Title II of the Social Security Act is based on correct legal standards and supported by substantial evidence. The Commissioner's final decision is AFFIRMED and this case is DISMISSED.

DATED this 21st day of December, 2004.

/s/ Janice M. Stewart___________________
Janice M. Stewart

United States Magistrate Judge